Good morning your honors and may it please the court my name is Andrew Koenig, attorney for plaintiff appellant Lena Drawn. I want to presentively apologize for my voice and if I happen to cough I've been fighting a bug for a couple of weeks now. You can keep me company when I cough. I'm wondering I heard I heard a familiar sound on the last oral argument in the microphone but I'll do my best to speak up for Judge Graber also. The medical vocational guidelines in Social Security ruling in Social Security law are very well defined. The medical vocational guidelines we all call the grids and if with permission I'll refer to them as the grids do not contemplate non-exertional impairments such as mental impairments which our client did not even allege a physical disability. Her case was solely on her mental impairments and I have to assert frankly I don't think this case is close as far as whether or not the facts support the standard of whether or not there's a sufficiently severe non-exertional impairment to render the grids inapplicable. In this case it's step five. Your Honors, we have a profile of three hospitalizations for mental, well hospitalizations because of suicidal ideation. She has PTSD from being raped as a child from ages 12 to 14. We have auditory hallucinations, visual hallucinations, paranoia. She's been in mental health treatment not only as a child but then transitioned from the child services through the county into adult services. Her treating psychiatrist at Ventura County Behavioral Health, Dr. Parsa, issued a medical source statement that 100% unequivocally finds her disabled mentally. We also have two that support a step five finding of disability. As a practitioner for over 25 years, if I get one consultative examiner supportive, I feel like I've found gold. You're typically trying to overcome consultative examiners opinions in establishing disability. We have two that support step five finding of disability. Your Honors, this is not a close case as far as factual proof of mental impairments that meet the sufficiently severe standard under Ninth Circuit law, the Burkhart case, the Derosier case. They go back to the 80s. We have clearly established law that at step five, if we have mental impairments, the grids don't apply. They are part of a framework but they cannot be exclusively relied on. We had a vocational expert at this hearing. The judge, I don't want to come off as too aggressive, basically flaunted the law by not even asking the vocational expert one single question. The attorney, and it was not me at the hearing, did ask questions to the vocational expert based on even some moderate impairments and the vocational expert said there's no jobs that a person can do. If I'm sitting in that chair at the administrative hearing and I have my factual record with two CE supportive, a treating doctor supportive, we have an IQ test that meets a listing at 57, I'm thinking, if the judge says no vocational expert testimony, I'm walking out of there thinking I have a win in my pocket. Let me go at this a slightly different way and maybe with a little particularity. Could I ask, obviously what you're saying is that Dr. Garcia is not to be relied on. Give me more detail as to why Dr. Garcia is not to be relied on. Dr. Garcia obviously is a non-examining doctor that only reviewed partial records. But even in that point, Dr. Garcia in assessing the paragraph B findings of social functioning, activities of daily living, concentration, persistence, and pace in episodes of deterioration, found greater limitations than the judge did. The judge actually rejected the paragraph B, adopted the findings, they're a little incongruous and inconsistent between the paragraph B findings and the functional limitations for an RFC assessment. But basically, the judge's paragraph B findings are supported by no medical, all four, the two CEs, the treating doctor, Dr. Garcia, and there's actually a Dr. Mendez prior to Dr. Garcia that agreed with Dr. Garcia, and the judge didn't even assess that. That's an error also, but obviously not the crux basis of our claim. But this judge just did not follow not only social security regulations and law about assessing at step five and requiring use of a vocational expert at step five, but basically rejected every single treating doctor or examining doctor or non-examining doctor opinion at some level. The findings just cannot be supported by substantial evidence based on this record. That's the point on the step five grid rule. And I've got to just say, before I move on, if this record is upheld as finding that the grids could direct a finding of non-disability under these facts, it's going to turn precedent on its head. No attorney is going to have any ability to assess cases at step five under mental impairments. It would put the vocational expert industry out of business. There's absolutely no reason to have a vocational expert with this profile to say we can rely on the grids that don't even contemplate mental impairments. I hesitate to impose on you in this way because this is really irrelevant to the case in front of us. It's just a matter of educating. I've seen a lot of social security cases, and they tend to be older people. I've never seen one so young. How does she even qualify? What are the criteria that bring her in in terms of coverage for disability? Well, that brings in the grids also. The grids are based on age categories. Fifty and younger is a very high standard. Fifty to fifty-four, a little bit lower standard, on and on. If you're disabled mentally, you're disabled mentally whether you're disabled or not. Does any seventeen-year-old who's disabled get social security benefits? Not seventeen. They'd have to be on SSI as a child. Once you reach a majority age of eighteen, they'd have an adult criteria listing. This is just an SSI case also. Eighteen to sixty-five, it's all the same assessment as far as mental illness if you're mentally disabled. My questions are so awkward because I'm not asking them properly. How does the coverage come in? Does she have to have worked? Does she have to have paid into social security? Does she have to have a social security number issued at birth? What entitles her even to be considered? Just to clarify, Your Honor, there's the Retirement Survivor and Disability Insurance Program that does require working and paying into the system. The SSI, Supplemental Security Income, is a purely welfare benefit for disabled poor people. You don't have to work or pay a nickel in tax your entire life. This is the safety net that keeps poor disabled people from living in cardboard boxes on the streets. I see. So she comes in under that one. This is purely a Title II SSI case, Your Honor. Now there could be potential future benefits for her if she's disabled before age 22 under the insurance program. If a parent becomes disabled, dies or retires, you can piggyback on that earnings record. Another reason why this is so important to her because if she establishes disability for SSI under age 22, when mom or dad in the future dies or retires, she can get more benefits in Medicare under their earnings record. So it's really critical at this age group. You know, she was under 22 when this was adjudicated. If we're establishing this, it could mean those future benefits under the insurance program. I hope that clarifies. That helps me. Okay. Okay. Thank you. Why don't we hear from the other side? Yeah, and I'm sorry. If I could reserve the remaining for rebuttal. Sure. Thank you. Good morning, Your Honors. Elizabeth Feer on behalf of Nancy Berryhill, the Acting Commissioner of Social Security. Obviously the grid issue is the one that my opponent is bringing forth as the primary issue right here. And what the rules are is that an ALJ may not rely on the grid unless the non-exertional limitations significantly impact the work base. This claimant does not have any physical limitations, which means under the grids up to medium jobs, there are 2,500 occupations that the grid contemplates that are unskilled work that someone without physical limitations could perform. And that's just medium. The claimant here is not precluded from higher than medium work also. So in that situation, and this court has actually ruled in an unpublished case, Angulo, which the district court cited, that someone who is limited to light work with the same exact non-exertional limitations, the ALJ did not need FEE in that case. So this is, the ALJ properly relied on the grids here. And there are enough jobs available under that. I'm not getting this. The argument is that she's physically capable of doing those things, but she's mentally disabled. Well, obviously we don't believe she's mentally disabled. We disagree then. Okay. So let's get into whether or not she's mentally disabled. Okay. Well, my opponent is looking at this record in the absolute most negative light possible, but that's not what the agency is required to do, and that's not what the standard of review requires. I would like to direct your honors to page 492 in the record, where a claimant's treaters at Ventura County, where she's treated for most of her life, actually, said, Luna is a good mother. She's resilient, smart, and motivated. And this record overall proves that initial analysis. If you look at Dr. Parsa, who is the treating source, who in January 2014 issued that very dire functional report, she says on the first page of that report, the claimant's medications control her symptoms. So then you look at Dr. Parsa's actual treatment records, which in this case, I'm just going to direct your attention to Exhibit 14F. That's mostly in 2013, and in that case, Dr. Parsa has all kinds of mental status examination findings, not the subjective account of claimant's symptoms, but the objective test results that are clearly consistent with, they show that claimant has age appropriate thought processes, that linear thinking, that even though she's got a depressed mood sometimes, her thoughts are normal, her insight and judgment are fair. And the records that are specifically from November 2013, and this is, I'm going to direct you to, it's 14F, starting on page 2, attitude cooperative, speech normal for age, sensorium alert, fully alert, linear thinking. Then you go to the next page, and this is where I'm going to disagree with my opponent, that the ALJ's findings that the claimant doesn't have the moderate limitations in social functioning, activities of daily living, concentration that Dr. Garcia found. Dr. Parsa herself says social functioning, minimal impairment, ADLs, no impairment reported, this is in November 2013. If you go through that exhibit, there are multiple times when she says the same thing, no social impairment or minimal, no occupational impairment or moderate at the most, and the other one with the activities of daily living, no impairment. This is, the ALJ looked at this evidence, this is even after Dr. Garcia, Dr. Garcia issued his opinion in August 2013, this is November 2013, these are treating source records that fully support the ALJ's findings that the claimant was not moderately limited in all of those categories. So that's what we have in terms of this record showing that yes, the claimant has problems, yes she has had very sad things happen to her over her life, but she is capable of taking care of her child now. If you look at her hearing testimony, which is even later in the record, I think that was in March 2014, it's in 2014 anyway, you look at her testimony, the only thing she says doesn't allow her to work is being paranoid and thinking that people are looking at her. That's not a very specific limitation and it's not consistent with the extreme limitations that Dr. Parsa said in January 2014 that are actually inconsistent with her treatment records through at least 2013. Exhibit 8 is also Dr. Parsa, exhibit 8 I believe goes through June through December 2012 and in the beginning the claimant has problems, but that exhibit clearly shows improvement with the medication. And then you have Dr. Parsa herself saying on the form, her symptoms are controlled with medication. That is substantial evidence supporting the ALJ's claim that she is capable of performing simple repetitive tasks. And simple repetitive tasks in and of themselves do not preclude reliance on the grid given the vast job base the claimant can perform given the grid. Council, I've been looking at the report, I believe it's by Dr. Martin. And Dr. Martin, who I believe examined her in person, paints a pretty rough picture. And I believe Dr. Garcia did not examine her in person. Well, there's a strong presumption in these circumstances that Dr. Martin's analysis we should weigh more heavily than Dr. Garcia's and if there's a reason to discount Dr. Martin's, there has to be very specific reasons from the ALJ to do so. What were the reasons for doing so here? Well, the ALJ says that it's not supported by the record as a whole and that at that particular examination, the ALJ says on page 16 that exhibit 13F is inconsistent with treating source progress. I just reiterated how that's absolutely true, that it's not consistent with Dr. Parsa's treating source records. And then the ALJ also says that the claimant at that particular exam made allegations that don't show up anywhere else in the record. And Dr. Garcia absolutely supports that. On page 64, Dr. Garcia goes through a list of why this consultative examination is not supported. The claimant said at that examination, first of all, she was upset. She showed up upset. At every other examination, she's cooperative, calm. In fact, there's a CE exam literally one week before Dr. Martin's where the doctor said she was pleasant, cooperative, and engaged in the discussion. So a week later, the claimant shows up to Dr. Martin's examination upset. But she starts saying that she's different people during the course of her, that she changes who she is based on her mood. She says she thinks she's Nicki Minaj sometimes. That's not in the record anywhere else. And this is a woman who has a very extensive psychological history that's well documented. She's never said that before. So Dr. Garcia, who did look at that and looked at more evidence than Dr. Martin did, who just saw her on that one day, and Dr. Garcia says that those symptoms don't make sense, and that's not supported by the record as a whole. Dr. Garcia is a psychiatrist. Right, but I mean, and I'm not, but it seems to me that they don't make sense unless someone's mentally ill. Well, we know she's mentally ill. The ALJ found significant impairments in step two. But when someone thinks that there's a boy, Timothy, that's going to kill her or telling her to kill people. She never said that. But there's a boy, Timothy, that talks to her, right? At the hearing, she said that she hadn't heard him in over eight months. Right, okay, but let's talk about what she did say about Timothy, right? She said Timothy encouraged her to hurt herself or something like that? She says various things at times. Sometimes she says, she just hears voices saying, hey. She says that he tells her sometimes to do bad things to herself or others. I would also point out that Dr. Garcia and also Dr. Mencken, who reviewed the record two months before Dr. Garcia, said that those aren't hallucinations. They're illusions. She said that this is part of her history, but how does that limit her from working? I'm not sure I would want to hire someone who thinks there's a boy, Timothy, telling her to hurt herself or others. Well, again, she goes long periods where she doesn't hear from Timothy. Your Honor, please look at the records. That's what I'm reading. Okay, well, look at the, even with those symptoms, and those symptoms do appear in many of Dr. Parse's treatment records, but even with those symptoms, look at the part in the middle that's O, these are SOAP reports, subjective objective assessment plan. The objective part is largely normal, even with these symptoms that she's alleging. And then you have her saying, the last record we have from Dr. Parse that says her symptoms are controlled as medication. That supports the ALJ's conclusion that while clean is limited, she's not limited to where she can't perform unskilled work. And another thing about Dr. Garcia, he found these moderate limitations in the different categories of functioning, but he also endorsed unskilled work. That's on page, sorry, my notes are not as organized as usual. But I guess I'm still having, trying to have a hard time understanding that this is a different type of disability case. This is not the situation if someone has one hand or has a broken leg or something like that. I mean, if someone is hearing voices from Timothy telling her to hurt people, I understand it's not every day this happens. It may not be that frequently. In any job, skilled or unskilled, if I'm an employer, and again, you have to be a VA and I understand all that, but still, it seems to be difficult to put someone even on an unskilled production line if they're hearing voices from someone telling them to hurt other people. Well, with all due respect, that's your layperson's conclusion of this record. We do have experts who looked at it, are fully aware of those symptoms, and found that this claimant could perform work. And Dr. Garcia is an expert in disability analysis. He saw this actually fairly late in the game here. He reviewed the record in August 2013. If you look at what happened after August 2013, in Dr. Parse's notes, she can't, maybe this will help, she can't make a functional assessment that's completely inconsistent with those treatment records that show relatively normal mental status examinations. And that's what we have here. We have the ALJ, who is the one person charged with looking at this entire record and synthesizing it into a functional capacity assessment. The ALJ did that. It's supported by findings. And it's on page 69 where Dr. Garcia says, after he's looked at all of this evidence, including Timothy, including the Nicki Minaj, says that he's endorsing the earlier conclusion of unskilled work from Dr. Mankin. And both Dr. Mankin on pages 67 to 69, I believe, and Dr. Garcia, that's their link, Garcia is like 67 to 69 and Mankin is 51 to 53. If you look at their mental functional capacity assessments, they have these moderate limitations here and there that the ALJ didn't fully accept, but they also concluded that the claimant was capable of unskilled work. And I see my time is way up. So unless you have any further questions, we would ask that you uphold the ALJ's conclusion. And the two district court judges who also found the ALJ's decision was supportive. Thank you. Thank you. Counselor criticizes Dr. Parsons' conclusions based on treatment records. In longitudinal mental health treatment, it's always possible to pick and choose periods of improvement versus periods of deterioration. The Garrison court talks about the waxing and waning of symptoms. Same with Ghanem. You have to take a look at the overall picture. Judge Owens was correct. We had hallucinations with Timothy. She's on antipsychotic medications now that help control those hallucinations, but the mere fact that we're talking about this undermines the finding that the grids apply. We have severe, there's an admission of extensive psychological history, mental illness. The grids do not contemplate these types of mental limitations. The questions from Judge Owens I interpret as, should we be finding her disabled at Step 5? Mine's a more minimal argument of, is there substantial evidence to support the Step 5 finding of, you know, there's no non-exertional impairments to even impact work functioning, therefore the grids apply. I do. I agree. If we look at the treating doctor and the two examining doctors, we have a remand for payment of benefits. I'm just, you know, actually the focus of my argument is, do the grids even apply? And this record is so replete with severe mental illness, there's no way we can just say the grids contemplate all these factors. I would even argue that simple repetitive tasks that's found by the judge is not contemplated by the grids. There's nothing in the grids that say, we're limiting this person to simple repetitive tasks. Social Security ruling 8515 talks about unskilled work. It says if there's anything more than very little mental or non-exertional, you need a vocational expert. There's absolutely no support in the record for the grids applying here, Your Honor, as the sole source of decision making. Thank you. Thank you. Thank both sides for their arguments. Dran v. Berryhill submitted for decision.
judges: Graber, W. Fletcher, Owens